941 So.2d 540 (2006)
Catherine GARRIS, Appellant,
v.
THOMASVILLE-THOMAS COUNTY HUMANE SOCIETY, INC., Appellee.
No. 1D05-5811.
District Court of Appeal of Florida, First District.
November 15, 2006.
*541 Rob McNeely and Cynthia A. McNeely of the McNeely Law Firm, Tallahassee, for Appellant.
Brian S. Duffy, Mary L. Wakeman and Brandice D. Dickson of McConnaughhay, Duffy, Coonrod, Pope & Weaver, P.A., Tallahassee, for Appellee.
BENTON, J.
Catherine Garris appeals dismissal of claims she brought against Thomasville-Thomas County Humane Society, Inc. (Humane Society), a Georgia corporation, not for profit. The trial court ruled that it lacked jurisdiction over the person of the Humane Society. We reverse and remand for further proceedings.
The first amended complaint stated claims for intentional infliction of emotional distress, conversion, breach of bailment,[1] and, in connection with events that allegedly transpired when Mrs. Garris visited *542 the Humane Society and questioned an employee about her dogs' demise, assault and battery.[2] She urged the circuit court to assume jurisdiction over the Humane Society under three separate provisions of Florida's long arm statute, maintaining that the circuit court had general jurisdiction under section 48.193(2), Florida Statutes (2005), as well as specific jurisdiction under sections 48.193(1)(f)(1.) and (g), Florida Statutes (2005). Unwilling to submit to the court's jurisdiction on any basis, without a special appearance to litigate the jurisdictional question, the Humane Society filed its motion to dismiss and to quash the service of process, attaching affidavits supporting its position. See Venetian Salami Co. v. Parthenais, 554 So.2d 499, 502 (Fla.1989).
The Humane Society maintained that the circuit court lacked personal jurisdiction over it because it was neither a resident nor a citizen of Florida, but was instead incorporated and located in Georgia, had no office in Florida, and had no representatives or agents resident in Florida. The Humane Society also argued that it dealt with Ms. Garris only when she was in Georgia, except by telephone when, although she was in Florida, she was speaking to a Humane Society employee[3] in Georgia. As to the foregoing factual matters, there was no dispute.
*543 Ms. Garris did dispute the Humane Society's argumentsand its factual assertions in supportthat the Humane Society did not engage in business activities in Florida, did not conduct substantial activities in Florida, did not advertise in a manner that would subject the Humane Society to jurisdiction in Florida, and did not perform any other act that would bring it within the jurisdiction of Florida courts, consistently with traditional notions of fair play and substantial justice.
The trial court conducted an evidentiary hearing limited to the jurisdictional question, at which the plaintiff assumed the burden to prove a basis for jurisdiction. See id. at 502-03. See also Res. Healthcare of Am., Inc. v. McKinney, 940 So.2d 1139, 1141 (Fla. 2d DCA 2006) ("Once the court determines that the facts are sufficient to bring the defendant within the reach of the long-arm statute, the court must also consider whether the defendant has sufficient minimum contacts with the state so that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. This requires the court to determine whether the defendant has availed itself of the privilege of doing business in Florida or has committed acts with an effect in Florida such that it would anticipate being haled into Florida courts.") (citation omitted).
After the hearing on jurisdiction, the trial court entered an amended final judgment determining that the court lacked personal jurisdiction, and, on that basis, granting the motion to dismiss and to quash the service of process.[4] Specifically with regard to the issue of general jurisdiction, the trial court concluded that the evidence was insufficient to establish that the Humane Society purposefully availed itself of any privilege in Florida or engaged in any activity in Florida, except for insubstantial and isolated contacts.[5]
We review a ruling on a motion to dismiss for lack of personal jurisdiction de novo. See Wendt v. Horowitz, 822 So.2d 1252, 1256 (Fla.2002). Foreign corporations may be subject to the jurisdiction of Florida courts, even as to claims arising from activity and effects occurring outside Florida, where they are also "engaged in substantial and not isolated activity within this state[.]" § 48.193(2), Fla. Stat. (2005). See, e.g., Travel Opportunities of Fort Lauderdale, Inc. v. Walter Karl List Mgmt., Inc., 726 So.2d 313, 315 (Fla. 4th DCA 1998) ("[I]t is not necessary for a defendant to have a physical presence in a state for jurisdiction to attach.").
A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.
*544 § 48.193(2), Fla. Stat. (2005). Jurisdiction under this section does not require that the claim arise from activity or effects within Florida, nor that there be any "connexity" between the claim and the defendant's activities in Florida. See, e.g., Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) ("Jurisdiction in [certain] circumstances may not be avoided merely because the defendant did not physically enter the forum State."); Camp Illahee Investors, Inc. v. Blackman, 870 So.2d 80, 85 (Fla. 2d DCA 2003) ("This section [48.193(2)] `does not require connexity between a defendant's activities and the cause of action.'") (quoting Woods v. Nova Cos. Belize Ltd., 739 So.2d 617, 620 (Fla. 4th DCA 1999)).
The Humane Society's raison d'etre is the welfare and control of animals in Thomas County, Georgia, and it accomplishes its purposes in part by placing animals for adoption, on a continuous and systematic basis, including not incidentally with Florida residents. Everybody who adopts an animal from the Humane Society assumes certain undertakings, notably to see that the animal is spayed or neutered, failing which the Humane Society reserves the right to repossess the adopted animal. The Humane Society must approve the veterinarian who operates on the animal, and has approved several veterinarians in Florida. (The Humane Society reimburses veterinarians it has approved for spay and neuter procedures they perform on animals, including animals it places for adoption.) Many Georgia residents who adopt animals take them to Tallahassee for spaying or neutering because these services are dramatically less expensive when done by certain providers in Tallahassee.
The Humane Society also sends newsletters to its Florida members, solicits donations from Floridians, and has ongoing relationships with several Florida animal aid organizations, including arrangements under which it regularly transfers animals to them for adoption in Florida. While most of the animals the Humane Society places for adoption come from Thomas County, some come from Florida.[6]
To determine whether jurisdiction exists over the person of a non-resident defendant, courts apply a two-part test. See, e.g., Dean v. Johns, 789 So.2d 1072, 1075 (Fla. 1st DCA 2001); Price v. Point Marine, Inc., 610 So.2d 1339, 1341 (Fla. 1st DCA 1992). A Florida court must first determine "that the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of the statute." Dean, 789 So.2d at 1075 (quoting Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co., 752 So.2d 582, 584 (Fla.2000)). Section 48.193(1), Florida Statutes (2005), provides for specific jurisdiction over a nonresident, while section 48.193(2) provides for the courts' general jurisdiction over persons[7] *545 not resident in Florida "engaged in substantial and not isolated activity within" Florida. § 48.193(2), Fla. Stat. (2005). If the allegations meet a statutory test and the plaintiff can establish the facts required by the test the long arm statute prescribes, "the next inquiry is whether sufficient `minimum contacts' are demonstrated to satisfy due process requirements." Dean, 789 So.2d at 1075.
When, as here, the question whether a Florida court has "general" jurisdiction over the person of a nonresident defendant arises under section 48.193(2), these separate inquiries merge. "[I]f the defendant's activities meet the requirements of section 48.193(2), [constitutional due process] minimum contacts [are] also satisfied." Id. at 1077. It has also been said, however, that the "minimum contacts" necessary for "general jurisdiction" are "significantly more than [the] mere minimum contacts" required as a predicate for "specific jurisdiction" over a nonresident defendant. Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987).
No state's courts can exercise jurisdiction over nonresident corporations except in keeping with the requirements of federal due process laid down in International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. The International Shoe court explained that "there have been instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." Id. at 318, 66 S.Ct. 154. The Court also explained that the criteria for determining jurisdiction are not "mechanical or quantitative," but that whether due process is satisfied depends upon the "quality and nature of the activity." Id. at 319, 66 S.Ct. 154.
A single, fortuitous contact with the forum state is not enough. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295-99, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (holding out-of-state wholesaler and retailer could not be haled into court to defend in a state with which their only connection was a single automobile accident involving a car they sold outside the state). But purposeful, ongoing contacts with Florida were held to support jurisdiction in Woods, where a resident of Belize injured in an aircraft accident in Costa Rica sued the aircraft's owner, a Belizean corporation (Nova), in Broward county. Woods, 739 So.2d at 619-21.
Where a nonresident defendant has a cognizable connection with the forum state, a second question must be addressed: whether requiring the defendant to appear in the forum state would work a substantial injustice or amount to an imposition that could not reasonably have been *546 foreseen. See Int'l Shoe, 326 U.S. at 316, 66 S.Ct. 154 (holding state court's assertion of personal jurisdiction must comport with "`traditional notions of fair play and substantial justice'") (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). See also Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); State ex rel. Weber v. Register, 67 So.2d 619, 621 (Fla. 1953).
Here, on the second Thursday of every month, a representative of the Humane Society has appeared, with one or more animals, on "Pet of the Week," a television program WCTV Channel 6 broadcasts in an area that includes both Tallahassee and Thomasville.[8] The television studio is in Leon County, Florida, and a representative of the Humane Society brings the animals into Florida to film the segment. The purpose is to inform the viewing audience (in Florida and Georgia) that the animal on the show is available for adoption and to urge viewers to contact the Humane Society to adopt the animal (and other animals) from the Humane Society. The executive director of the Humane Society testified that its mission is to see that animals are adoptednot just by Georgia residentsand that the Humane Society is "not specifically seeking Florida residents, but we're seeking anyone who would be willing to adopt the animal in the TV station that serves Thomasville as well." The Humane Society has continuously and systematically "marketed animals for adoption" to Floridians in this manner by participating in this television program (at no cost to the Humane Society) for many years.[9]
The Humane Society also advertises animals *547 for adoption on Petfinder.com.[10] Florida residents adopt animals from the Humane Society at least eight to ten times per year.[11] The Humane Society also accepts animals from Florida residents any time they are surrendered to the Humane Society. The Humane Society maintains a website on which it advertises that it "accepts all animals and there is no charge to leave an animal."
As part of the adoption process, the Humane Society requires adopters to execute a "Sterilization Contract," which requires the spaying or neutering of the newly adopted pet before it reaches six months of age. In this connection, a "sterilization deposit" must be paid to the Humane Society as part of the adoption fee. Although the adopter may select the veterinarian to perform the procedure, any veterinarian selected must be approved by the Humane Society. Once the approved veterinarian does the work, the veterinarian bills the Humane Society, and the Humane Society reimburses the veterinarian directly (if not always in full). Certain veterinarians in Florida are approved and reimbursed on a regular basis.
For Thomas County residents who cannot afford to pay for spaying or neutering a dog or cat acquired from sources other than the Humane Society, the Humane Society provides "spay/neuter gift certificates," as long as it has the funds. The executive director testified that Animal Aid in Tallahassee is a popular choice for recipients of these certificates because its veterinarians perform the procedures for the amount of money the Humane Society contributes, whereas the same procedures can cost up to three times as much in Thomasville. On average, the Humane Society reimburses Animal Aid in Tallahassee for ten to twenty of these procedures per month.[12]
*548 The Humane Society asks the Leon County Humane Society some three or four times a year to take animals it can no longer keep. In addition, the Humane Society lets the Leon County Humane Society know whenever it receives bobcats or polydactyl catscats with six or more digits on a single paw. Big Dog Rescue is another Florida-based rescue group to which the Humane Society regularly turns asking that Big Dog Rescue take large dogs (and possibly other animals) whenever the Humane Society anticipates the necessity of euthanizing them otherwise. The Humane Society systematically and continuously transfers polydactyl cats, bobcats and large dogs to Floridians for adoption in Florida.
The Humane Society mails newsletters to its members, of whom nine per cent are Florida residents, two to four times a year. The newsletters include invitations to fundraisers and solicitations for donations, and Floridians sometimes respond. The Humane Society also sends invitations to its members for special fundraising events four or five times a year. See Obermaier v. Kenneth Copeland Evangelistic Ass'n, Inc., 208 F.Supp.2d 1288, 1291 (M.D.Fla. 2002) (finding general jurisdiction based on fact that defendant "solicits contributions from Florida residents using local television stations in Naples, Florida as well as internet websites [and] sends mail into Florida in response to donations by Florida residents").
The Woods court recounted that Nova was in the business of farming shrimp in Belize for export to the United States, that it dealt with a Florida broker, that eighteen per cent of its sales were made to shrimp importers in Florida; and that Nova purchased supplies from Florida through a separate company that transported them to Belize. The court found that Nova's contacts with Florida were continuous and systematic, and justified a Florida court's exercise of general jurisdiction. See id. at 620.
This "continuous and systematic" contacts standard was the standard enunciated *549 by the Supreme Court in Helicopteros [Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984),[13]] as sufficient to fulfill the due process requirements of minimum contacts when asserting general jurisdiction. Because section 48.193(2) requires this high threshold, if the defendant's activities meet the requirements of section 48.193(2), minimum contacts is also satisfied.
Id. (citation omitted). But Nova did not own property in Florida, was not registered to do business in Florida, did not advertise in Florida, and did not maintain an address, telephone listing, or bank account in Florida. See id. at 619. The Woods court relied, however, on the fact that Nova's activities affecting Florida were not "haphazard or fortuitous," and ruled that "[w]hile any one of these activities alone may not be deemed sufficient, considered collectively, they establish personal jurisdiction." Id. at 621.
As in Woods, the connection between the Humane Society and Florida is neither haphazard nor fortuitous. In the present case, too, the connection is based on substantial activities the defendant purposefully directed toward Florida residents. The Humane Society did not merely place some product in the stream of interstate commerce, nor is it unreasonable or unfair to require the Humane Society to cross, not the Gulf of Mexico or the Pacific Ocean, but the state line, to defend in a jurisdiction where it regularly does business. Cf. Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102, 106-16, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).
The Humane Society purposefully avails itself of a variety of privileges under Florida law, in drawing on various Florida resources to accomplish its goals. In order to place animals for adoption, it directs significant, systematic, continuous, substantial, and not isolated activities toward residents of Florida, targeting the populous Florida "market." The Humane Society's contacts with Florida are continuous, ongoing, and systematic, not isolated, sporadic, or haphazard. Given these contacts, there is nothing unforeseeable, unfair, or unjust about requiring the Humane Society to respond to the process of a Florida court. The lower court erred in declining to exercise its general jurisdiction over the Humane Society pursuant to section 48.193(2), Florida Statutes (2005), in dismissing the complaint, and in quashing service of process.
Reversed and remanded.
KAHN and LEWIS, JJ., concur.
NOTES
[1] The trial court seems to have confused the document (referred to in the order under review as an "Animal ID") that she attached to her complaint as part of her claim that a bailment had been created with the document (referred to as a "Sterilization Contract") that the Humane Society required people to execute when adopting pets:

Similarly, the Animal ID invoices were entered into evidence by the Plaintiff show[ing] nothing more than the adoptions took place in Georgia. Plaintiff asserts that the Animal ID invoices are continuing contracts with Florida adoptors such that the Defendant retains the right to demand the return of the adopted animal at any time and, therefore, has continuing contracts with multiple Florida residents. The court declines to view the invoices as contracts. As such, Plaintiff's argument fails.
In fact, there is no contention for jurisdictional purposes "that the Animal ID invoices are continuing contracts" and the evidence about written agreements (Sterilization Contracts) by which numerous Floridians undertook to have adopted animals spayed or neutered was undisputed.
[2] Ms. Garris alleged the Humane Society euthanized two dogs she had left at its animal shelter in Thomasville, in hopes that it would find somebody suitable to adopt them. Her complaint alleged that she (herself a former volunteer at the animal shelter) had been given to understand that the Humane Society operated a "no-kill" facility, and that she had been assured by employees of the shelter that she would be called if the dogs could not be adopted, in which case, she was told, she could reclaim the dogs; but that she was never contacted, and that the dogs were euthanized without her knowledge or consent.

In the posture the case reaches us, we offer no opinion on the viability of any of these claims. These questions can be taken up on remand. In the proceedings that gave rise to the appeal, the trial court decided only that minimum contacts did not exist, pretermitting consideration of defense contentions that no claim had been stated on which relief could be granted, ruling:
The purpose of the hearing today is not to determine whether there is merit to any of the claims or whether the claim states a cause of action in any of these claims but whether or not the Court has jurisdiction over any of these matters.
. . . .
Well, I'll grant the motion to dismiss on the jurisdictional grounds, so there's no need for the Court to address the other grounds.
Similarly, we do not decide whether claims asserted as bases for specific jurisdiction state causes of action, nor any other issue pertaining only to specific jurisdiction. Cf. Godfrey v. Neumann, 373 So.2d 920, 922 (Fla.1979) (holding "that by committing a tort in Florida a nonresident establishes sufficient `minimum contacts' with Florida to justify the acquisition of [specific] in personam jurisdiction over him").
Because we decide no question of "specific jurisdiction," we need not consider, even on a "tipsy coachman" theory, whether claims for relief have been adequately stated. See generally Dade County Sch. Bd. v. Radio Station WQBA, 731 So.2d 638, 644-45 (Fla.1999); Am. Overseas Marine Corp. v. Patterson, 632 So.2d 1124, 1127 (Fla. 1st DCA 1994) (explaining that specific jurisdiction "requires a causal connection between the defendant's activities in the forum state and the plaintiff's cause of action"). We conclude rather that, because the Humane Society directed substantial and not isolated activities toward Florida systematically and continuously, Florida has general judicial jurisdiction over the Humane Society.
[3] Ms. Garris has never sought to obtain personal jurisdiction over any officer or employee of the Humane Society. See generally Doe v. Thompson, 620 So.2d 1004, 1006 (Fla. 1993) ("While Southland Corporation, which operates businesses in Florida, could be haled into court because of its minimum contacts, its chief executive officer is not [simply] by virtue of his position subject to personal jurisdiction.").
[4] Ms. Garris originally appealed the trial court's final judgment on the motion to dismiss her complaint and quash the service of process, but we determined that the order appealed was not final, and relinquished jurisdiction for the trial court to enter a final order. The trial court then entered an amendment to the final judgment, stating that, although the order of dismissal had been a final judgment, it had not specified that the cause was dismissed. The court added a sentence to the original order, dismissing the cause in its entirety based on the asserted lack of personal jurisdiction, and the appeal proceeded from this amended final judgment.
[5] We disagree with the trial court's analysis. The trial court made findings of fact, which are binding on us (unless without substantial support in competent evidence of record, see, e.g., ante note 1), although the trial court's conclusions of law are subject to de novo review. All of the contacts the Humane Society had with Florida, taken together, establish substantial and not isolated activity within Florida.
[6] The southern boundary of Thomas County is also the Florida state line. Given that cats and dogs do not respect political boundaries, the Humane Society's policy of accepting animals for adoption from Florida residents is a rational one.
[7] Section 48.193(2) was held to confer jurisdiction in a medical malpractice case a Florida patient brought against a physician who resided in Alabama and had treated her there. See Dean v. Johns, 789 So.2d 1072, 1074-75 (Fla. 1st DCA 2001). But cf. Bachman v. Med. Eng'g Corp., 81 Or.App. 85, 724 P.2d 858 (1986). We catalogued the doctor's activities involving Florida:

[The defendant] has treated over 3,200 Florida patients, is licensed to practice medicine in Florida, subjects himself to Florida regulation for the practice of medicine in Florida (including continuing medical education requirements), regularly consults with Florida physicians by telephone, renders reports to Florida physicians for use intreating Florida patients in Florida, and owns rental property in Florida.
Dean, 789 So.2d at 1078. The Dean court determined that the doctor's activities amounted to substantial and not isolated contacts with Florida, explaining that substantial and not isolated activity occurred whenever there was "`continuous and systematic general business contact' with Florida." Dean, 789 So.2d at 1077 (quoting Woods v. Nova Cos. Belize Ltd., 739 So.2d 617, 620 (Fla. 4th DCA 1999)). But see generally Burnham v. Superior Court of Cal., 495 U.S. 604, 610 n. 1, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990) ("It may be that whatever special rule exists permitting `continuous and systematic' contacts, to support jurisdiction with respect to matters unrelated to activity in the forum applies only to corporations, which have never fitted comfortably in a jurisdictional regime based primarily upon `de facto power over the defendant's person.' International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).") (citation omitted).
[8] In connection with "marketing" in Florida, both parties cite Camp Illahee Investors, Inc. v. Blackman, 870 So.2d 80 (Fla. 2d DCA 2003), where parents of a camper, all Florida residents, asserted jurisdiction over the summer camp their daughters attended in North Carolina alleging, among other things, that one of them had been tortiously injured there. See id. at 83. Camp Illahee, a North Carolina corporation, successfully argued that the court lacked personal jurisdiction because it was located in North Carolina, had no offices or employees in Florida, and did not advertise in Florida by newspaper, radio, or television. The only activity in Florida or directed to Florida residents occurred once a year when the owners of Camp Illahee conducted "reunion and video shows" in the homes of "camp families." Id.

The Camp Illahee case is readily distinguishable from the present case. Minimal contact on annual visits to Florida contrasts starkly with the Humane Society's monthly advertising to thousands of television viewers, not to mention the Floridians who received the Humane Society's mailings. The present case more closely resembles Gorman v. Grand Casino of Louisiana, Inc.-Coushatta, 1 F.Supp.2d 656, 659 (E.D.Tex.1998) (predicating long arm jurisdiction on "a pervasive, systematic, and continuous local advertising campaign"). More importantly, the plaintiff in the present case relies not just on the Humane Society's marketing to Floridians, but also on a plethora of other contacts.
[9] We reject the analysis the order under review set out in connection with television advertising and direct mail:

The court also finds the Plaintiff's assertions that Defendant's advertising on WCTV subjects it to jurisdiction unpersuasive. [The executive director] testified that the Defendant's intent is to advertise to Georgia residents and to advertise that animals are available for adoption in Georgia. Similarly, the Defendant's mailings into Florida to its established members is not purposeful availment of any privilege in Florida. The Plaintiff has failed to show that the Defendant's acts rise to the level of anything other than isolated activities and, therefore, this court cannot exercise general jurisdiction over the Defendant.
The executive director's testimony was clear that there was no effort to limit the advertising to Georgians or to exclude Floridians.
[10] Here, as in Obermaier v. Kenneth Copeland Evangelistic Ass'n, Inc., 208 F.Supp.2d 1288, 1292 (M.D.Fla.2002), "internet use by Florida residents was both intended and reasonably foreseeable. These contacts with Florida are such that the defendant should reasonably anticipate being haled into court in Florida," particularly here, where they occur in the context of so many other contacts. Because of the other contacts, we "need not decide . . . whether standing alone the Web site maintained by the defendant is sufficient to satisfy a finding of general jurisdiction." Mieczkowski v. Masco Corp., 997 F.Supp. 782, 788 (E.D.Tex.1998).
[11] This rate has likely increased since the Humane Society began bringing animals to a Petco store in Tallahassee, offering them for adoption to Florida residents. Whether this practice began before or after the filing of the complaint is not entirely clear, however. For jurisdictional purposes, a court may consider contacts that occur after the cause of action arises. See Dean, 789 So.2d at 1077-78 (considering activity of the defendant in the "period of years prior to the plaintiff's filing of the complaint") (quoting Woods, 739 So.2d at 621).
[12] All told, the Humane Society may pay for dozens of spay or neuter procedures in Florida each month. The monies the Humane Society pays for veterinary services in Tallahassee amounts to hundreds of dollars every month. The trial court found and concluded:

Specifically, the court finds Plaintiff's argument unavailing that Defendant's reimbursement to Florida veterinarians subjects it to the jurisdiction of the state. First, the Defendant did not perform the subject veterinary services. Second, the Defendant had no control over where the services were performed; rather, the individual adoptors chose for themselves where the services were to be performed. Third, the Defendant derived no benefit from performing the ministerial act of reimbursement.
While we disagree with the trial court's analysis in this regard, we are mindful of the Court's holding in Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), "that purchases and related trips, standing alone, are not a sufficient basis for a State's assertion of jurisdiction."
[W]e hold that mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions. Nor can we conclude that the fact that Helicol sent personnel into Texas for training in connection with the purchase of helicopters and equipment in that State in any way enhanced the nature of Helicol's contacts with Texas. The training was a part of the package of goods and services purchased by Helicol from Bell Helicopter. The brief presence of Helicol employees in Texas for the purpose of attending the training sessions is [not] significant. . . .
Id. at 418, 104 S.Ct. 1868 (footnote omitted). We assume that veterinary services should be treated like the training services purchased in Texas in Helicopteros, and we do not rest our holding on these purchases of services alone or on the trips into Florida that they necessitate. On the other hand, their numerosity and regularity underscore the broad interdependence between the Humane Society and an array of Floridians in various capacities. Taken as a whole, the Humane Society's activities within Florida availed it of multiple privileges under Florida law and "constitute[d] the kind of continuous and systematic general business contacts the Court found to exist in Perkins [v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952)]." Id. at 416, 104 S.Ct. 1868.
In Helicopteros, no products of Helicol ever reached a single Texas resident. In the present case, the Humane Society's "products" (the animals it places for adoption), regularly reach Florida residents. In Helicopteros, Helicol did not solicit business in Texas. In the present case, the Humane Society solicited business in Florida (adoptions) by going on a program that was broadcast in Florida every month for many years; representatives traveled to Florida, with the Humane Society's animals, to tape the show. Helicol made no effort to sell products or services within Texas. The Humane Society also solicited donations by mailing newsletters and invitations to fundraisers, nine per cent of which went to Florida residents.
[13] In Helicopteros, 466 U.S. at 408, 104 S.Ct. 1868, the Court stated the rule as follows:

Even when the cause of action does not arise out of or relate to the foreign corporation's activities in the forum State, due process is not offended by a State's subjecting the corporation to its in personam jurisdiction when there are sufficient contacts between the State and the foreign corporation.
Id. at 414, 104 S.Ct. 1868 (footnote omitted).